**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LANDON W. PERDUE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MYLAN N.V., MYLAN INC., HEATHER BRESCH, ROBERT J. COURY, PAUL B. CAMPBELL, KENNETH S. PARKS, and JOHN D. SHEEHAN,<br><br>Defendants. | **Case No.**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Landon W. Perdue ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Mylan N.V. and Mylan Inc. (collectively, "Mylan" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired the securities of Mylan N.V. and/or Mylan N.V.'s predecessor, Mylan Inc., between February 21, 2012 and October 5, 2016, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Mylan N.V., together with its subsidiaries, develops, licenses, manufactures, markets, and distributes generic, branded generic, and specialty pharmaceuticals worldwide. The Company provides generic or branded generic pharmaceutical products in tablet, capsule, injectable, transdermal patch, gel, cream, or ointment forms, as well as active pharmaceutical ingredients. Among other products, Mylan N.V. manufactures and sells the EpiPen Auto-Injector (the "EpiPen"), a branded device for injecting a measured dose of epinephrine by means of auto-injector technology to treat severe allergic reactions. Mylan N.V. is based in Hertfordshire, the United Kingdom.

3. Mylan Inc. is an indirect wholly owned subsidiary of Mylan N.V. Prior to February 27, 2015, Mylan Inc. preceded Mylan N.V. as the SEC registrant. In early 2015, Mylan Inc.'s business was reorganized under Mylan N.V. and led by the former officers and directors of Mylan Inc. On February 27, 2015, Mylan N.V. succeeded Mylan Inc. as the SEC registrant. On March 2, 2015, Mylan N.V.'s common stock began trading on the Nasdaq Global Select Market ("NASDAQ-GS") under the ticker symbol "MYL."

4. Medicaid is a U.S. government insurance program for persons whose income and resources are insufficient to pay for health care. Jointly funded by the state and federal

governments, Medicaid is the largest source of funding for medical and health-related services for Americans with low income. Between 2011 and 2015, Medicaid spent approximately $797 million on purchases of EpiPens from Mylan.

5. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Mylan paid Medicaid significantly lower EpiPen rebates than legally required; (ii) Medicaid had previously advised Mylan of the Company's obligation to pay higher rebates; (iii) Mylan therefore knowingly and systemically overcharged Medicaid for EpiPens in violation of federal law; (iv) millions of dollars of Mylan's revenue from EpiPen sales were the result of the foregoing illegal conduct by the Company; and (v) as a result of the foregoing, Mylan's public statements were materially false and misleading at all relevant times.

6. On September 2, 2016, *Inside Health Policy* published an article stating that the Centers for Medicare & Medicaid Services ("CMS"), a federal agency whose responsibilities include, *inter alia*, working in partnership with state governments to administer Medicaid, had "informed Mylan that [the Company] incorrectly classified EpiPen as a generic under the Medicaid rebate program, which caused financial consequences for federal and state governments by reducing the amount of quarterly rebates Mylan owed for its product."

7. On this news, Mylan's share price fell $1.95, or 4.65%, to close at $39.97 on September 2, 2016.

8. On October 5, 2016, *Bloomberg* reported that the CMS had issued a letter stating that Mylan had for years overcharged Medicaid to buy the Company's EpiPen shot, despite being told that the Company needed to provide bigger discounts under the law. The CMS letter stated

that from 2011 to 2015, the U.S. Medicaid health program spent approximately $797 million on EpiPens, including rebates of roughly ***13%***, rather than the discount of ***23.1%*** that the U.S. ***should*** have received. The letter stated that the government had previously "expressly told Mylan that the [EpiPen] product is incorrectly classified."

9. On this news, Mylan's share price fell $1.19, or 3.13%, to close at $36.84 on October 6, 2016.

10. On October 7, 2016, Mylan announced that it had reached a $465 million settlement with the U.S. Department of Justice and other agencies to resolve questions raised about the classification of EpiPen for Medicaid rebate purposes.

11. On October 7, 2016, Mylan also announced that the Company had "received a document request from the Division of Enforcement at the [SEC] seeking communications with the CMS and documents concerning Mylan products sold and related to the Medicaid Drug Rebate Program, and any related complaints."

12. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13. The claims asserted herein arise under and pursuant to §§10(b), 14(e) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78n(e) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

15. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Mylan N.V.'s stock trades on the NASDAQ-GS, located within this Judicial District.

16. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

17. Plaintiff, as set forth in the attached Certification, acquired Mylan securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

18. Defendant Mylan N.V. is incorporated in the Netherlands. Mylan N.V.'s principal executive offices are located at Building 4, Trident Place, Hertfordshire AL10 9UL, United Kingdom.

19. Defendant Mylan Inc. is incorporated in Pennsylvania. Mylan Inc.'s principal executive offices are located at 405 Lexington Avenue, Floor 52, New York, New York 10174.

20. Defendant Heather Bresch ("Bresch") has served as the Company's Chief Executive Officer ("CEO") since January 2012.

21. Defendant Robert J. Coury ("Coury") served as the Company's CEO from September 2002 to January 2012.

22. Defendant Paul B. Campbell ("Campbell") has served as the Company's Chief Accounting Officer since May 2015.

23. Defendant Kenneth S. Parks ("Parks") has served as the Company's Chief Financial Officer ("CFO") since June 2016.

24. Defendant John D. Sheehan ("Sheehan") served as the Company's CFO from April 2010 to April 2016.

25. The Defendants referenced above in ¶¶ 20-24 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

26. Mylan, together with its subsidiaries, develops, licenses, manufactures, markets, and distributes generic, branded generic, and specialty pharmaceuticals worldwide. The Company provides generic or branded generic pharmaceutical products in tablet, capsule, injectable, transdermal patch, gel, cream, or ointment forms, as well as active pharmaceutical ingredients. Among other products, Mylan manufactures and sells the EpiPen, a branded device for injecting a measured dose of epinephrine by means of auto-injector technology to treat severe allergic reactions.

27. Medicaid is a U.S. government insurance program for persons whose income and resources are insufficient to pay for health care. Jointly funded by the state and federal governments, Medicaid is the largest source of funding for medical and health-related services for Americans with low income. Between 2011 and 2015, Medicaid spent approximately $797 million on purchases of EpiPens from Mylan.

### Materially False and Misleading Statements Issued During the Class Period

28. The Class Period begins on February 21, 2012, when Mylan filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the

quarter and year ended December 31, 2011 (the "2011 10-K"). For the quarter, Mylan reported net income of $129.49 million, or $0.30 per diluted share, on revenue of $1.53 billion, compared to net income of $19.85 million, or $0.01 per diluted share, on revenue of $1.43 billion for the same period in the prior year. For 2011, Mylan reported net income of $536.81 million, or $1.22 per diluted share, on revenue of $6.13 billion, compared to net income of $345.12, or $0.68 per diluted share, on revenue of $5.45 billion for 2010.

29. In the 2011 10-K, Mylan stated, in relevant part:

> *Specialty Segment*
>
> Our specialty pharmaceutical business is conducted through Dey, which competes primarily in the respiratory, severe allergy and psychiatry markets. Dey's portfolio consists of primarily branded specialty injectable, nebulized and transdermal products for life-threatening conditions. Since our acquisition of Dey, a significant portion of Dey's revenues have been derived through the sale of the EpiPen® Auto-Injector.
>
> The EpiPen Auto-Injector, which is used in the treatment of severe allergies, is an epinephrine auto-injector which has been sold in the U.S. since 1980 and internationally since the mid-1980's. Dey has world-wide rights to the epinephrine auto-injector, supplied to Dey by Meridian Medical Technologies, and a worldwide license to the EpiPen trademark from Mylan. The EpiPen Auto-Injector is the number one prescribed auto-injector with over 90% market share in the U.S. and worldwide. The strength of the EpiPen brand name, quality and ease of use of the product and the promotional strength of the Dey U.S. sales force have enabled us to maintain our market share.
>
> . . .
>
> Medicaid, a U.S. federal health care program, requires all pharmaceutical manufacturers to pay rebates to state Medicaid agencies. The rebates are based on the volume of drugs that are reimbursed by the states for Medicaid beneficiaries. The Patient Protection and Affordable Care Act (the "PPACA") and the Health Care and Education and Reconciliation Act of 2010, which amends the PPACA, raised the rebate percentages for both generic and brand pharmaceuticals effective January 1, 2010. ***The required rebate is currently 13% of the average manufacturer's price for sales of Medicaid-reimbursed products marketed under ANDAs, up from 11% in prior years. Sales of Medicaid-reimbursed products marketed under NDAs require manufacturers to rebate the greater of approximately 23% (up from 15%) of the average manufacturer's price or the***

> ***difference between the average manufacturer's price and the best price during a specific period.*** We believe that federal or state governments may continue to enact measures aimed at reducing the cost of drugs to the public.

(Emphasis added.)

30. The 2011 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Coury and Sheehan, stating that the financial information contained in the 2011 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

31. On April 26, 2012, Mylan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2012 (the "Q1 2012 8-K"). For the quarter, Mylan reported net income of $129.08 million, or $0.30 per diluted share, on revenue of $1.58 billion, compared to net income of $104.18 million, or $0.23 per diluted share, on revenue of $1.45 billion for the same period in the prior year.

32. In the Q1 2012 8-K, Mylan stated, in relevant part:

> For the quarter ended March 31, 2012, Mylan's Specialty segment reported third party net revenues of $162.3 million, an increase of $65.3 million, or 67.3%, from the comparable prior year period of $97.0 million. The most significant contributor to Specialty segment revenues continues to be the EPIPEN® auto-injector, sales of which increased as a result of favorable pricing and growth in both the overall market and Mylan's market share. The EPIPEN® auto-injector is the number one epinephrine auto-injector for the treatment of severe allergic reactions and maintains a market share in excess of 95% in the United States.
>
> Gross profit for the quarter ended March 31, 2012 was $666.3 million and gross margins were 41.8%. In the comparable prior year period, gross profit was $590.9 million, and gross margins were 40.8%. Adjusted gross profit for the quarter ended March 31, 2012 was $760.0 million and adjusted gross margins were 48% as compared to adjusted gross profit of $681.8 million and adjusted gross margins of 47% in the comparable prior year period. The increase in adjusted gross margins was primarily the result of new product introductions in North America and favorable pricing on the EPIPEN® auto-injector, partially offset by the impact of pricing reductions in all regions of our generics segment.

33. On April 27, 2012, Mylan filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q1 2012 8-K and reporting in full the Company's financial and operating results for the quarter ended March 31, 2012 (the "Q1 2012 10-Q").

34. The Q1 2012 10-Q contained signed certifications pursuant to SOX by Defendants Bresch and Sheehan, stating that the financial information contained in the Q1 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

35. On July 26, 2012, Mylan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended June 30, 2012 (the "Q2 2012 8-K"). For the quarter, Mylan reported net income of $138.55 million, or $0.33 per diluted share, on revenue of $1.69 billion, compared to net income of $146.45 million, or $0.33 per diluted share, on revenue of $1.57 billion for the same period in the prior year.

36. In the Q2 2012 8-K, Mylan stated, in relevant part:

> For the current quarter, Mylan's Specialty segment reported third party net sales of $198.6 million, an increase of $66.9 million, or 50.8%, from the comparable prior year period of $131.7 million. The most significant contributor to Specialty segment revenues continues to be the EPIPEN® auto-injector, sales of which increased as a result of favorable pricing and growth in the overall market. The EPIPEN® auto-injector is the number one epinephrine auto-injector for the treatment of severe allergic reactions.
>
> Gross profit for the three months ended June 30, 2012, was $699.2 million and gross margins were 41.3%. For the three months ended June 30, 2011, gross profit was $669.4 million, and gross margins were 42.5%. Adjusted gross profit, as further defined below, for the three months ended June 30, 2012 was $819.2 million and adjusted gross margins were 49% as compared to adjusted gross profit of $758.7 million and adjusted gross margins of 48% in the comparable prior year period. The increase in adjusted gross margins was primarily the result of favorable volume and

> pricing on the EPIPEN® auto-injector and new products, partially offset by the impact of unfavorable pricing in all regions of our generics segment.

37. On July 26, 2012, Mylan also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2012 8-K and reporting in full the Company's financial and operating results for the quarter ended June 30, 2012 (the "Q2 2012 10-Q").

38. The Q2 2012 10-Q contained signed certifications pursuant to SOX by Defendants Bresch and Sheehan, stating that the financial information contained in the Q2 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

39. On October 25, 2012, Mylan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended September 30, 2012 (the "Q3 2012 8-K"). For the quarter, Mylan reported net income of $211.26 million, or $0.51 per diluted share, on revenue of $1.80 billion, compared to net income of $156.70 million, or $0.36 per diluted share, on revenue of $1.58 billion for the same period in the prior year.

40. In the Q3 2012 8-K, Mylan stated, in relevant part:

> For the current quarter, Mylan's Specialty segment reported third party net sales of $294.1 million, an increase of $80.1 million, or 37.4%, from the comparable prior year period of $213.9 million. The most significant contributor to Specialty segment revenues continues to be the EPIPEN® auto-injector, sales of which increased as a result of favorable pricing and volume, including growth in the overall market. The EPIPEN® auto-injector is the number one epinephrine auto-injector for the treatment of severe allergic reactions.
>
> Gross profit for the three months ended September 30, 2012, was $788.5 million and gross margins were 43.6%. For the three months ended September 30, 2011, gross profit was $658.4 million, and gross margins were 41.8%. Adjusted gross profit, as further defined below, for the three months ended September 30, 2012 was $940.6 million and adjusted gross margins were 52% as compared to adjusted

> gross profit of $763.9 million and adjusted gross margins of 48% in the comparable prior year period. The increase in adjusted gross margins was primarily the result of new product introductions in North America and the increase in sales of the EPIPEN® auto-injector, partially offset by the impact of unfavorable pricing on existing products in all regions within our Generics segment.

41. On October 25, 2012, Mylan also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q3 2012 8-K and reporting in full the Company's financial and operating results for the quarter ended September 30, 2012 (the "Q3 2012 10-Q").

42. The Q3 2012 10-Q contained signed certifications pursuant to SOX by Defendants Bresch and Sheehan, stating that the financial information contained in the Q3 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

43. On February 27, 2013, Mylan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter and year ended December 31, 2012 (the "2012 8-K"). For the quarter, Mylan reported net income of $161.96 million, or $0.39 per diluted share, on revenue of $1.72 billion, compared to net income of $129.49 million, or $0.30 per diluted share, on revenue of $1.53 billion for the same period in the prior year. For 2012, Mylan reported net income of $640.85 million, or $1.52 per diluted share, on revenue of $6.80 billion, compared to net income of $536.81 million, or $1.22 per diluted share, on revenue of $6.13 million for 2011.

44. In the 2012 8-K, Mylan stated, in relevant part:

> For the current quarter, Mylan's Specialty segment reported third party net sales of $145.3 million, an increase of $40.6 million, or 38.8%, from the comparable prior year period of $104.7 million. The most significant contributor to Specialty segment revenues continues to be the EPIPEN® Auto-Injector, sales of which increased as a result of favorable pricing and volume, including growth in the

> overall market. The EPIPEN® Auto-Injector is the number one epinephrine auto-injector for the treatment of severe allergic reactions.
>
> Gross profit for the three months ended December 31, 2012, was $742.3 million and gross margins were 43.1%. For the three months ended December 31, 2011, gross profit was $644.6 million, and gross margins were 42.1%. Adjusted gross profit, as further defined below, for the three months ended December 31, 2012 was $845.4 million and adjusted gross margins were 49% as compared to adjusted gross profit of $732.2 million and adjusted gross margins of 48% in the comparable prior year period. The increase in adjusted gross margins was primarily the result of new product introductions in North America during 2012 and the increase in sales of the EPIPEN® Auto-Injector, partially offset by the impact of unfavorable pricing on existing products in all regions within our Generics segment.

45. On February 28, 2013, Mylan filed an Annual Report on Form 10-K with the SEC, reiterating the financial and operating results previously announced in the 2012 8-K and reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2012 (the "2012 10-K"). In the 2012 10-K, Mylan stated, in relevant part:

> *Specialty Segment*
>
> Our specialty pharmaceutical business is conducted through Mylan Specialty, which competes primarily in the respiratory, severe allergy and psychiatry markets. Mylan Specialty's portfolio consists of primarily branded specialty injectable, nebulized and transdermal products for life-threatening conditions. A significant portion of Mylan Specialty's revenues are derived through the sale of the EPIPEN® Auto-Injector.
>
> The EPIPEN® Auto-Injector, which is used in the treatment of severe allergic reactions, is an epinephrine auto-injector that has been sold in the U.S. and internationally since the mid-1980s. Mylan Specialty has worldwide rights to the epinephrine auto-injector, which is supplied to Mylan Specialty by a wholly owned subsidiary of Pfizer. Anaphylaxis is a severe allergic reaction that is rapid in onset and may cause death, either through swelling that shuts off airways or through significant drop in blood pressure. In December 2010, the National Institute of Allergy and Infectious Diseases, a division of the National Institutes of Health, introduced the "Guidelines for the Diagnosis and Management of Food Allergy in the United States." These guidelines state that epinephrine is the first line treatment for anaphylaxis. The EPIPEN® Auto-Injector is the number one prescribed epinephrine auto-injector. The strength of the EPIPEN® brand name, quality and ease of use of the product and the promotional strength of the Mylan Specialty U.S. sales force have enabled us to maintain our market share.

. . .

> Medicaid, a U.S. federal health care program, requires all pharmaceutical manufacturers to pay rebates to state Medicaid agencies. The rebates are based on the volume of drugs that are reimbursed by the states for Medicaid beneficiaries. The Patient Protection and Affordable Care Act (the "PPACA") and the Health Care and Education and Reconciliation Act of 2010, which amends the PPACA, raised the rebate percentages for both generic and brand pharmaceuticals effective January 1, 2010. ***The required rebate is currently 13% of the average manufacturer's price for sales of Medicaid-reimbursed products marketed under ANDAs, up from 11% for periods prior to 2010. Sales of Medicaid-reimbursed products marketed under NDAs require manufacturers to rebate the greater of approximately 23% (up from 15%) of the average manufacturer's price or the difference between the average manufacturer's price and the best price during a specific period.*** We believe that federal or state governments may continue to enact measures aimed at reducing the cost of drugs to the public.

(Emphasis added.)

46. The 2012 10-K contained signed certifications pursuant to SOX by Defendants Bresch and Sheehan, stating that the financial information contained in the 2012 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

47. On May 2, 2013, Mylan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2013 (the "Q1 2013 8-K"). For the quarter, Mylan reported net income of $106.88 million, or $0.27 per diluted share, on revenue of $1.63 billion, compared to net income of $129.08 million, or $0.309 per diluted share, on revenue of $1.58 billion for the same period in the prior year.

48. In the Q1 2013 8-K, Mylan stated, in relevant part:

> For the current quarter, Mylan's Specialty segment reported third party net sales of $211.6 million, an increase of $40.6 million, or 23.7%, from the comparable prior year period of $171.1 million. The most significant contributor to Specialty segment revenues continues to be the EPIPEN® Auto-Injector, sales of which increased as a result of favorable pricing. The EPIPEN® Auto-Injector is the number one epinephrine auto-injector for the treatment of severe allergic reactions. In addition, Perforomist® Inhalation Solution sales increased by double digits from the comparable prior year period as a result of favorable pricing and volume.

> Gross profit for the three months ended March 31, 2013, was $693.5 million and gross margins were 42.5%. For the three months ended March 31, 2012, gross profit was $670.2 million, and gross margins were 42.3%. Adjusted gross profit, as further defined below, for the three months ended March 31, 2013 was $796.5 million and adjusted gross margins were 49% as compared to adjusted gross profit of $760.0 million and adjusted gross margins of 48% in the comparable prior year period. The increase in adjusted gross margins was primarily the result of the increase in sales of the EPIPEN® Auto-Injector and margins on new products, partially offset by the impact of unfavorable pricing on existing products in all regions within our Generics segment.

49. On May 2, 2013, Mylan also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q1 2013 8-K and reporting in full the Company's financial and operating results for the quarter ended March 31, 2013 (the "Q1 2013 10-Q").

50. The Q1 2013 10-Q contained signed certifications pursuant to SOX by Defendants Bresch and Sheehan, stating that the financial information contained in the Q1 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

51. On August 1, 2013, Mylan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended June 30, 2013 (the "Q2 2013 8-K"). For the quarter, Mylan reported net income of $177.69 million, or $0.46 per diluted share, on revenue of $1.70 billion, compared to net income of $138.55 million, or $0.33 per diluted share, on revenue of $1.69 billion for the same period in the prior year.

52. In the Q2 2013 8-K, Mylan stated, in relevant part:

> For the current quarter, Mylan's Specialty segment reported third party net sales of $236.9 million, an increase of $30.3 million, or 14.7%, from the comparable prior year period of $206.6 million. The most significant contributor to Specialty segment revenues continues to be the EPIPEN® Auto-Injector, sales of which

> increased as a result of favorable pricing and volume. The EPIPEN® Auto-Injector is the number one epinephrine auto-injector for the treatment of severe allergic reactions.
>
> Gross profit for the three months ended June 30, 2013, was $742.4 million and gross margins were 43.6%. For the three months ended June 30, 2012, gross profit was $702.6 million, and gross margins were 41.6%. Adjusted gross profit, as further defined below, for the three months ended June 30, 2013 was $834.2 million and adjusted gross margins were 49% as compared to adjusted gross profit of $819.3 million and adjusted gross margins of 49% in the comparable prior year period. Adjusted gross margins were positively impacted in the current quarter as a result of the increase in sales of the EPIPEN® Auto-Injector and margins on new products, which was offset the impact of unfavorable pricing on existing products in all regions within our Generics segment.

53. On August 1, 2013, Mylan also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2013 8-K and reporting in full the Company's financial and operating results for the quarter ended June 30, 2013 (the "Q2 2013 10-Q").

54. The Q2 2013 10-Q contained signed certifications pursuant to SOX by Defendants Bresch and Sheehan, stating that the financial information contained in the Q2 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

55. On October 31, 2013, Mylan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended September 30, 2013 (the "Q3 2013 8-K"). For the quarter, Mylan reported net income of $158.91 million, or $0.40 per diluted share, on revenue of $1.77 billion, compared to net income of $211.26 million, or $0.51 per diluted share, on revenue of $1.80 billion for the same period in the prior year.

56. In the Q3 2013 8-K, Mylan stated, in relevant part:

> For the current quarter, Mylan's Specialty segment reported third party net revenues of $357.2 million, an increase of $55.4 million, or 18.4%, from the comparable prior year period of $301.8 million. The most significant contributor to Specialty segment revenues continues to be the EPIPEN® Auto-Injector, sales of which increased as a result of favorable pricing and volume. The EPIPEN® Auto-Injector is the number one epinephrine auto-injector for the treatment of severe allergic reactions. In addition, Perforomist® Inhalation Solution sales increased by double digits from the comparable prior year period as a result of favorable pricing and volume.
>
> Gross profit for the three months ended September 30, 2013 was $808.5 million, and gross margins were 45.7%. For the three months ended September 30, 2012, gross profit was $793.1 million, and gross margins were 44.0%. Adjusted gross profit, as further defined below, for the three months ended September 30, 2013 was $903.2 million and adjusted gross margins were 51% as compared to adjusted gross profit of $940.5 million and adjusted gross margins of 52% in the comparable prior year period. Adjusted gross margins were positively impacted in the current quarter as a result of the increase in sales of the EPIPEN® Auto-Injector and higher margins on products launched in 2013, which were more than offset by the impact of unfavorable pricing on existing products in all regions within our Generics segment, including products launched in the prior year.

57. On October 31, 2013, Mylan also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q3 2013 8-K and reporting in full the Company's financial and operating results for the quarter ended September 30, 2013 (the "Q3 2013 10-Q").

58. The Q3 2013 10-Q contained signed certifications pursuant to SOX by Defendants Bresch and Sheehan, stating that the financial information contained in the Q3 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

59. On February 27, 2014, Mylan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter and year ended December 31, 2013 (the "2013 8-K"). For the quarter, Mylan reported net income of $180.20 million, or $0.45 per diluted share, on revenue of $1.80 billion, compared

to net income of $161.96 million, or $0.39 per diluted share, on revenue of $1.72 billion for the same period in the prior year. For 2013, Mylan reported net income of $623.70 million, or $1.58 per diluted share, on revenue of $6.91 billion, compared to net income of $640.85 million, or $1.52 per diluted share, on revenue of $6.80 billion for 2012.

60. In the 2013 8-K, Mylan stated, in relevant part:

> For the current quarter, Mylan's Specialty segment reported third party net revenues of $176.1 million, an increase of $20.2 million, or 13.0%, from the comparable prior year period of $155.9 million. The most significant contributor to Specialty segment revenues continues to be the EpiPen® Auto-Injector, sales of which increased as a result of favorable pricing and volume. The EpiPen® Auto-Injector is the number one dispensed epinephrine auto-injector.
>
> Gross profit for the three months ended December 31, 2013 was $796.0 million, and gross margins were 44%. For the three months ended December 31, 2012, gross profit was $742.3 million, and gross margins were 43%. Adjusted gross profit, as further defined below, for the three months ended December 31, 2013 was $930.2 million and adjusted gross margins were 51% as compared to adjusted gross profit of $845.4 million and adjusted gross margins of 49% in the comparable prior year period. Adjusted gross margins were favorably impacted in the current quarter as a result of higher margins on new product introductions and favorable pricing and volume on the EpiPen® Auto-Injector. These increases were partially offset by lower gross margins on existing products primarily as a result of unfavorable pricing within the Generics segment as discussed above.

61. On February 27, 2014, Mylan also filed an Annual Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the 2013 8-K and reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2013 (the "2013 10-K").

62. In the 2013 10-K, Mylan stated, in part:

> *Specialty Segment*
>
> Our specialty pharmaceutical business is conducted through Mylan Specialty, which competes primarily in the respiratory, severe allergy and psychiatry markets. Mylan Specialty's portfolio consists of primarily branded specialty injectable, nebulized and transdermal products for life-threatening conditions. A significant

> portion of Mylan Specialty's revenues are derived through the sale of the EPIPEN® Auto-Injector.
>
> The EPIPEN® Auto-Injector, which is used in the treatment of severe allergic reactions, is an epinephrine auto-injector that has been sold in the U.S. and internationally since the mid-1980s. Mylan Specialty has worldwide rights to the epinephrine auto-injector, which is supplied to Mylan Specialty by a wholly owned subsidiary of Pfizer. Anaphylaxis is a severe allergic reaction that is rapid in onset and may cause death, either through swelling that shuts off airways or through significant drop in blood pressure. In December 2010, the National Institute of Allergy and Infectious Diseases, a division of the National Institutes of Health, introduced the "Guidelines for the Diagnosis and Management of Food Allergy in the United States." These guidelines state that epinephrine is the first line treatment for anaphylaxis. The EPIPEN® Auto-Injector is the number one prescribed epinephrine auto-injector. The strength of the EPIPEN® brand name, quality and ease of use of the product and the promotional strength of the Mylan Specialty U.S. sales force have enabled us to maintain our market share.
>
> . . .
>
> Medicaid, a U.S. federal health care program, requires all pharmaceutical manufacturers to pay rebates to state Medicaid agencies. The rebates are based on the volume of drugs that are reimbursed by the states for Medicaid beneficiaries. The Patient Protection and Affordable Care Act (the "PPACA") and the Health Care and Education and Reconciliation Act of 2010, which amends the PPACA, raised the rebate percentages for both generic and brand pharmaceuticals effective January 1, 2010. ***The required rebate is currently 13% of the average manufacturer's price for sales of Medicaid-reimbursed products marketed under ANDAs, up from 11% for periods prior to 2010. Sales of Medicaid-reimbursed products marketed under NDAs require manufacturers to rebate the greater of approximately 23% (up from 15%) of the average manufacturer's price or the difference between the average manufacturer's price and the best price during a specific period.*** We believe that federal or state governments may continue to enact measures aimed at reducing the cost of drugs to the public.

(Emphasis added.)

63. The 2013 10-K contained signed certifications pursuant to SOX by Defendants Bresch and Sheehan, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

64. On May 1, 2014, Mylan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the

quarter ended March 31, 2014 (the "Q1 2014 8-K"). For the quarter, Mylan reported net income of $115.90 million, or $0.29 per diluted share, on revenue of $1.72 billion, compared to net income of $106.88 million, or $0.27 per diluted share, on revenue of $1.63 billion for the same period in the prior year.

65. In the Q1 2014 8-K, Mylan stated, in relevant part:

> For the three months ended March 31, 2014, Mylan's Specialty segment reported third party net sales of $194.7 million, a decrease of $16.9 million, or 8.0%, from the comparable prior year period of $211.6 million. The decrease was the result of lower sales of the EpiPen® Auto-Injector, as a result of lower volumes due to a decline in wholesaler inventory levels during the quarter, only partially offset by favorable pricing. Third party net sales in the Specialty segment were also negatively impacted in the current period as a result of the discontinuation of a contract manufacturing agreement unrelated to the EpiPen® Auto-Injector. Offsetting these declines, sales of the Perforomist® Inhalation Solution increased from the comparable prior year period as a result of favorable pricing and volume.

66. On May 1, 2014, Mylan also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q1 2014 8-K and reporting in full the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 10-Q").

67. The Q1 2014 10-Q contained signed certifications pursuant to SOX by Defendants Bresch and Sheehan, stating that the financial information contained in the Q1 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

68. On August 7, 2014, Mylan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 8-K"). For the quarter, Mylan reported net income of $152.20 million, or $0.32 per diluted share, on revenue of $1.84 billion, compared to net income

of $177.69 million, or $0.46 per diluted share, on revenue of $1.70 billion for the same period in the prior year.

69. In the Q2 2014 8-K, Mylan stated, in relevant part:

> **Specialty Segment Revenue**
>
> Specialty segment reported third party net sales of $287.8 million for the quarter, an increase of 22% when compared to the prior year period. The increase was due to higher sales of the EpiPen® Auto-Injector driven by market expansion, as well as price. The effect of constant currency on Specialty segment third party net sales was insignificant. The EpiPen® Auto-Injector remains on track to become a billion dollar product in 2014.
>
> **Total Gross Profit**
>
> Adjusted gross profit was $923.4 million and adjusted gross margins were 50% as compared to adjusted gross profit of $834.2 million and adjusted gross margins of 49% in the comparable prior year period. Strong adjusted gross margins were the result of growth in the EpiPen® Auto-Injector combined with the benefits and efficiencies of Mylan's vertically integrated operating platform. These increases were offset partially by unfavorable pricing on existing products, including products launched in the prior year. GAAP gross profit for the quarter was $808.8 million and GAAP gross margins were 44% as compared to GAAP gross profit of $742.4 million and GAAP gross margins of 44% in the comparable prior year period.
>
> **Total Profitability**
>
> Adjusted earnings from operations for the quarter were $409.9 million, down less than 1% from the comparable prior year period. The decrease in adjusted earnings from operations was due to an increase in SG&A and R&D. The increase in SG&A was impacted by our direct-to-consumer marketing campaign for the EpiPen® Auto-Injector, and to a lesser extent, by increases in legal and marketing costs in the North American region of the Generics business to support anticipated new product launches. R&D was at the high end of the guidance range as we continued to progress our biologics and respiratory growth platforms. GAAP earnings from operations were $226.1 million for the quarter, a decrease of 27% from the comparable prior year period.

70. On August 7, 2014, Mylan also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2014 8-K and

reporting in full the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q").

71. The Q2 2014 10-Q contained signed certifications pursuant to SOX by Defendants Bresch and Sheehan, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

72. On October 30, 2014, Mylan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 8-K"). For the quarter, Mylan reported net income of $499.10 million, or $1.26 per diluted share, on revenue of $2.08 billion, compared to net income of $158.91 million, or $0.40 per diluted share, on revenue of $1.77 billion for the same period in the prior year.

73. In the Q3 2014 8-K, Mylan stated, in part:

> **Specialty Segment Revenue**
>
> Specialty segment reported third party net sales of $462.0 million for the quarter, an increase of 29% when compared to the prior year period. The increase was due to higher net sales of the EpiPen® Auto-Injector driven by increased volume and favorable pricing. The increased quarterly volume resulted from double-digit growth of the epinephrine auto-injector market. The EpiPen® Auto-Injector remains on track to become a billion dollar product in 2014.
>
> **Total Gross Profit**
>
> Adjusted gross profit was $1.13 billion and adjusted gross margins were 54% for the quarter as compared to adjusted gross profit of $903.2 million and adjusted gross margins of 51% in the comparable prior year period. Strong adjusted gross margins were the result of new products and growth in the EpiPen® Auto-Injector. GAAP gross profit for the quarter was $1.01 billion and GAAP gross margins were 49% as compared to GAAP gross profit of $808.5 million and GAAP gross margins of 46% in the comparable prior year period.
>
> **Total Profitability**

> Adjusted earnings from operations for the quarter were $659.3 million, up 43% from the comparable prior year period. SG&A expense increased from the prior year period as a result of increased selling and marketing investments related to the EpiPen® Auto-Injector franchise as well as increased legal and marketing costs in the North American region to support anticipated new product launches. R&D expense also increased as we continued to invest in our biologics and respiratory growth platforms. GAAP earnings from operations were $495.0 million for the quarter, an increase of 46% from the comparable prior year period.

74. On November 5, 2014, Mylan filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q3 2014 8-K and reporting in full the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q").

75. The Q3 2014 10-Q contained signed certifications pursuant to SOX by Defendants Bresch and Sheehan, stating that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

76. On March 2, 2015, Mylan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 8-K"). For the quarter, Mylan reported net income of $189.20 million, or $0.47 per diluted share, on revenue of $2.08 billion, compared to net income of $180.20 million, or $0.45 per diluted share, on revenue of $1.81 billion for the same period in the prior year. For 2014, Mylan reported net income of $929.40 million, or $2.99 per diluted share, on revenue of $7.72 billion, compared to net income of $623.70 million, or $1.58 per diluted share, on revenue of $6.91 billion for 2013.

77. In the 2014 8-K, Mylan stated, in part:

> **Specialty Segment Revenue**
> Specialty segment reported third party net sales of $242.7 million for the quarter, an increase of 38% when compared to the prior year period. The increase was due

to higher net sales of the EpiPen® Auto-Injector driven by increased volume and favorable pricing. The increased quarterly volume resulted from continued growth of the epinephrine auto-injector market. Importantly, the EpiPen® Auto-Injector became Mylan's first product to reach $1 billion in annual net sales in 2014.

**Total Gross Profit**
Adjusted gross profit was $1.12 billion and adjusted gross margins were 54% for the quarter as compared to adjusted gross profit of $930.2 million and adjusted gross margins of 51% in the comparable prior year period. Strong adjusted gross margins were the result of new products and growth in the EpiPen® Auto-Injector. GAAP gross profit for the quarter was $969.0 million and GAAP gross margins were 47% as compared to GAAP gross profit of $795.9 million and GAAP gross margins of 44% in the comparable prior year period.

**Total Profitability**
Adjusted earnings from operations for the quarter were $606.0 million, up 34% from the comparable prior year period. SG&A expense increased from the prior year period as a result of increased selling and marketing investments related to the EpiPen® Auto-Injector franchise as well as increased infrastructure costs. R&D expense also increased as we continued to invest in our biologics and respiratory growth platforms. GAAP earnings from operations were $392.5 million for the quarter, an increase of 44% from the comparable prior year period.

78. On March 2, 2015, Mylan also filed an Annual Report on Form 10-K with the SEC, reiterating the financial and operating results previously announced in the 2014 8-K and reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K").

79. In the 2014 10-K, Mylan stated, in part:

*Specialty Segment*

Our specialty pharmaceutical business is conducted through Mylan Specialty, which competes primarily in the respiratory and severe allergy markets. Mylan Specialty's portfolio consists primarily of branded specialty injectable and nebulized products. A significant portion of Mylan Specialty's revenues are derived through the sale of the EpiPen® Auto-Injector. During 2014, the EpiPen® Auto-Injector became the first Mylan product to reach $1 billion in annual net sales.

The EpiPen® Auto-Injector, which is used in the treatment of severe allergic reactions, is an epinephrine auto-injector that has been sold in the U.S. and internationally since the mid-1980s. Mylan Specialty has worldwide rights to the epinephrine auto-injector, which is supplied to Mylan Specialty by a wholly owned

> subsidiary of Pfizer Inc. Anaphylaxis is a severe allergic reaction that is rapid in onset and may cause death, either through swelling that shuts off airways or through significant drop in blood pressure. In December 2010, the National Institute of Allergy and Infectious Diseases, a division of the National Institutes of Health, introduced the "Guidelines for the Diagnosis and Management of Food Allergy in the United States." These guidelines state that epinephrine is the first line treatment for anaphylaxis. The EpiPen® Auto-Injector is the number one dispensed epinephrine auto-injector. The strength of the EpiPen® brand name, quality and ease of use of the product and the promotional strength of the Mylan Specialty U.S. sales force have enabled us to maintain our leadership position within this therapeutic category.
>
> . . .
>
> Medicaid, a U.S. federal health care program, requires all pharmaceutical manufacturers to pay rebates to state Medicaid agencies. The rebates are based on the volume of drugs that are reimbursed by the states for Medicaid beneficiaries. The Patient Protection and Affordable Care Act (the "PPACA") and the Health Care and Education and Reconciliation Act of 2010, which amends the PPACA, raised the rebate percentages effective January 1, 2010. ***The required rebate is currently 13% of the average manufacturer's price for sales of Medicaid-reimbursed non-innovator products, up from 11% for periods prior to 2010. Sales of Medicaid-reimbursed innovator or single-source products require manufacturers to rebate the greater of approximately 23% (up from 15%) of the average manufacturer's price or the difference between the average manufacturer's price and the best price during a specific period.*** We believe that federal or state governments may continue to enact measures aimed at reducing the cost of drugs to the public.

(Emphasis added.)

80. The 2014 10-K contained signed certifications pursuant to SOX by Defendants Bresch and Sheehan, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

81. On May 5, 2015, Mylan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 8-K"). For the quarter, Mylan reported net income of $56.60 million, or $0.13 per diluted share, on revenue of $1.87 billion, compared to net income

of $115.90 million, or $0.29 per diluted share, on revenue of $1.72 billion for the same period in the prior year.

82. In the Q1 2015 8-K, Mylan stated, in relevant part:

> **Specialty Segment Revenue**
>
> Specialty segment reported third party net sales of $211.1 million for the quarter, an increase of 8% when compared to the prior year period. This increase was primarily due to higher net sales of the EpiPen® Auto-Injector driven by increased volume.
>
> . . .
>
> **Total Profitability**
>
> Adjusted earnings from operations for the quarter were $429.7 million, up 9% from the comparable prior year period. R&D expense increased primarily from the continued investment in our biologics and respiratory growth programs. SG&A expense increased from the prior year period as a result of increased costs related to acquired businesses and increased selling and marketing costs, primarily stemming from the EpiPen® Auto-Injector direct-to-consumer marketing campaign. GAAP earnings from operations were $159.3 million for the quarter, a decrease of 33% from the comparable prior year period. This decrease in earnings from operations during the current quarter was primarily the result of increased acquisition related costs and increased amortization expense as a result of the acquisition of the EPD Business.

83. On May 8, 2015, Mylan filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q1 2015 8-K and reporting in full the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q").

84. The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Bresch and Sheehan, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

85. On August 6, 2015, Mylan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 8-K"). For the quarter, Mylan reported net income of $167.80 million, or $0.32 per diluted share, on revenue of $2.37 billion, compared to net income of $125.20 million, or $0.32 per diluted share, on revenue of $1.84 billion for the same period in the prior year.

86. In the Q2 2015 8-K, Mylan stated, in part:

> **Specialty Segment Revenue**
>
> Specialty segment reported third party net sales of $301.9 million for the quarter, an increase of 5% when compared to the prior year period. This increase was primarily due to growth across the segment, including higher volumes of the EpiPen® Auto-Injector.

87. On August 6, 2015, Mylan also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2015 8-K and reporting in full the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q").

88. The Q2 2015 10-Q contained signed certifications pursuant to SOX by Defendants Bresch and Sheehan, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

89. On October 30, 2015, Mylan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 8-K"). For the quarter, Mylan reported net income of $428.60 million, or $0.83 per diluted share, on revenue of $2.70 billion, compared to

net income of $499.10 million, or $1.26 per diluted share, on revenue of $2.08 billion for the same period in the prior year.

90. In the Q3 2015 8-K, Mylan stated, in part:

> **Specialty Segment Revenues**
>
> Specialty segment reported third party net sales of $437.8 million for the quarter, a decrease of 5% when compared to the prior year period. This decrease was primarily due to a lower average net selling price for the EpiPen® Auto-Injector as a result of competitive market conditions.

91. On October 30, 2015, Mylan also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q3 2015 8-K and reporting in full the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").

92. The Q3 2015 10-Q contained signed certifications pursuant to SOX by Defendants Bresch and Sheehan, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

93. On February 10, 2016, Mylan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 8-K"). For the quarter, Mylan reported net income of $194.60 million, or $0.38 per diluted share, on revenue of $2.49 billion, compared to net income of $189.20 million, or $0.47 per diluted share, on revenue of $2.08 billion for the same period in the prior year. For 2015, Mylan reported net income of $847.60 million, or $1.70 per diluted share, on revenue of $9.43 billion, compared to net income of $929.40 million, or $2.34 per diluted share, on revenue of $7.72 billion for 2014.

94. In the 2015 8-K, Mylan stated, in part:

Specialty Segment Revenues

Specialty segment reported third party net sales were $254.1 million for the quarter, an increase of 5% when compared to the prior year period. This increase was primarily due to higher net sales of the EpiPen® Auto-Injector due to higher volumes, but with the same net payor pricing dynamics that existed throughout 2015.

. . .

Specialty segment reported third party net sales of $1.20 billion for the year, an increase of 1% when compared to the prior year. This increase was partially due to higher volumes of the EpiPen® Auto-Injector, which was offset by lower pricing. The EpiPen® Auto-Injector is the number one dispensed epinephrine auto-injector and as a global franchise reached $1 billion in annual net sales for the second year in a row. In addition, sales of the Perforomist® Inhalation Solution and ULTIVA® increased by double digit percentage points from the prior year.

95. On February 16, 2016, Mylan filed an Annual Report on Form 10-K with the SEC, reiterating the financial and operating results previously announced in the 2015 8-K and reporting in full the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K"). In the 2012 10-K, Mylan stated, in relevant part:

**Specialty Segment**

Our specialty pharmaceutical business is conducted through Mylan Specialty, which competes primarily in the respiratory and severe allergy markets. For the year ended December 31, 2015, Specialty third party net sales were $1.20 billion. Mylan Specialty's portfolio consists primarily of branded specialty injectable and nebulized products. A significant portion of Mylan Specialty's revenues are derived through the sale of the EpiPen® Auto-Injector. The EpiPen® Auto-Injector is the number one dispensed epinephrine auto-injector and as a global franchise reached $1 billion in annual net sales for the second year in a row.

The EpiPen® Auto-Injector, which is used in the treatment of severe allergic reactions, is an epinephrine auto-injector that has been sold in the U.S. and internationally since the mid-1980s. Mylan Specialty has worldwide rights to the epinephrine auto-injector, which is supplied to Mylan Specialty by a wholly owned subsidiary of Pfizer Inc. Anaphylaxis is a severe allergic reaction that is rapid in onset and may cause death, either through swelling that shuts off airways or through a significant drop in blood pressure. In December 2010, the National Institute of Allergy and Infectious Diseases, a division of the National Institutes of Health, introduced the "Guidelines for the Diagnosis and Management of Food Allergy in

> the United States." These guidelines state that epinephrine is the first line treatment for anaphylaxis. The EpiPen® Auto-Injector is the number one dispensed epinephrine auto-injector. The strength of the EpiPen® Auto-Injector brand name, quality and ease of use of the product and the promotional strength of the Mylan Specialty U.S. sales force have enabled us to maintain our leadership position within this therapeutic category.
>
> . . .
>
> Medicaid, a U.S. federal healthcare program, requires pharmaceutical manufacturers to pay rebates to state Medicaid agencies. The rebates are based on the volume of drugs that are reimbursed by the states for Medicaid beneficiaries. ***Sales of Medicaid-reimbursed non-innovator products require manufacturers to rebate 13% of the average manufacturer's price and, effective 2017, adjusted by the Consumer Price Index-Urban (the "CPI-U") based on certain data. Sales of the Medicaid-reimbursed innovator or single-source products require manufactures to the rebate the greater of approximately 23% of the average manufacturer's price or the difference between the average manufacturer's price and the best price adjusted by the CPI-U based on certain data.*** We believe that federal or state governments will continue to enact measures aimed at reducing the cost of drugs to the public.

(Emphasis added.)

96. The 2015 10-K contained signed certifications pursuant to SOX by Defendants Bresch and Sheehan, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

97. On May 3, 2016, Mylan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 8-K"). For the quarter, Mylan reported net income of $13.90 million, or $0.03 per diluted share, on revenue of $2.19 billion, compared to net income of $56.60 million, or $0.13 per diluted share, on revenue of $1.87 billion for the same period in the prior year.

98. In the Q1 2016 8-K, Mylan stated, in relevant part:

> **Specialty Segment Revenues**

> Specialty segment reported third party net sales were $247.9 million for the quarter, an increase of 17% when compared to the prior year period. This increase was primarily the result of higher volumes of the EpiPen® Auto-Injector and higher sales of the Perforomist® Inhalation Solution.

99. On May 3, 2016, Mylan also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q1 2016 8-K and reporting in full the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q").

100. The Q1 2016 10-Q contained signed certifications pursuant to SOX by Defendants Bresch and Campbell, stating that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

101. On August 9, 2016, Mylan issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 8-K"). For the quarter, Mylan reported net income of $168.40 million, or $0.33 per diluted share, on revenue of $2.56 billion, compared to net income of $167.80 million, or $0.32 per diluted share, on revenue of $2.37 billion for the same period in the prior year.

102. In the Q2 2016 8-K, Mylan stated, in relevant part:

> Specialty segment third party net sales were $402.5 million for the quarter, an increase of 33% when compared to the prior year period. This increase was primarily the result of higher unit volumes and the realization of the benefits of customer contract negotiations over the last several quarters related to the EpiPen® Auto-Injector, and higher sales of the Perforomist® Inhalation Solution and ULTIVA®.
>
> . . .
>
> Specialty segment third party net sales were $650.4 million for the six months ended June 30, 2016, an increase of 27% when compared to the prior year period.

> This increase was primarily the result of higher unit volumes and the realization of the benefits of customer contract negotiations over the last several quarters related to the EpiPen® Auto-Injector, and higher sales of the Perforomist® Inhalation Solution and ULTIVA®.

103. On August 9, 2016, Mylan also filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2016 8-K and reporting in full the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q").

104. The Q2 2016 10-Q contained signed certifications pursuant to SOX by Defendants Bresch and Parks, stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

105. The statements referenced in ¶¶ 28-104 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Mylan paid Medicaid significantly lower EpiPen rebates than legally required; (ii) Medicaid had previously advised Mylan of the Company's obligation to pay higher rebates; (iii) Mylan therefore knowingly and systemically overcharged Medicaid for EpiPens in violation of federal law; (iv) millions of dollars of Mylan's revenue from EpiPen sales were the result of the foregoing illegal conduct by the Company; and (v) as a result of the foregoing, Mylan's public statements were materially false and misleading at all relevant times.

**<u>The Truth Emerges</u>**

106. On September 2, 2016, *Inside Health Policy* published an article stating that the CMS had "informed Mylan that [the Company] incorrectly classified EpiPen as a generic under

the Medicaid rebate program, which caused financial consequences for federal and state governments by reducing the amount of quarterly rebates Mylan owed for its product."

107. On this news, Mylan's share price fell $1.95, or 4.65%, to close at $39.97 on September 2, 2016.

108. On October 5, 2016, *Bloomberg* reported that CMS had issued a letter stating that Mylan had for years overcharged Medicaid to buy the Company's EpiPen shot, despite being told that the Company needed to provide larger discounts under the law. The CMS letter stated that from 2011 to 2015, the U.S. Medicaid health program spent approximately $797 million on EpiPens, including rebates of roughly ***13%***, rather than the discount of ***23.1%*** that the U.S. ***should*** have received. The letter stated that the government had previously "expressly told Mylan that the [EpiPen] product is incorrectly classified."

109. On this news, Mylan's share price fell $1.19, or 3.13%, to close at $36.84 on October 6, 2016.

## Post-Class Period Disclosures

110. On October 7, 2016, Mylan announced that it had reached a $465 million settlement with the U.S. Department of Justice and other agencies to resolve questions raised about the classification of EpiPen for Medicaid rebate purposes.

111. On October 7, 2016, Mylan also announced that the Company had "received a document request from the Division of Enforcement at the [SEC] seeking communications with the CMS and documents concerning Mylan products sold and related to the Medicaid Drug Rebate Program, and any related complaints."

112. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

113. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Mylan securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

114. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Mylan securities were actively traded on the NASDAQ-GS. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Mylan or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

115. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

116. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

117. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Mylan;
- whether the Individual Defendants caused Mylan to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Mylan securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

118. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

119. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Mylan securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ-GS and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased, acquired and/or sold Mylan securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

120. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

121. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

122. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

123. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

124. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Mylan securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Mylan securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

125. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Mylan securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Mylan's finances and business prospects.

126. By virtue of their positions at Mylan, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

127. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Mylan securities from their personal portfolios.

128. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Mylan, the Individual Defendants had knowledge of the details of Mylan's internal affairs.

129. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Mylan. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Mylan's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Mylan securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Mylan's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Mylan securities at

artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

130. During the Class Period, Mylan securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Mylan securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Mylan securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Mylan securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

131. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

132. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

133. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

134. During the Class Period, the Individual Defendants participated in the operation and management of Mylan, and conducted and participated, directly and indirectly, in the conduct of Mylan's business affairs. Because of their senior positions, they knew the adverse non-public information about Mylan's misstatement of income and expenses and false financial statements.

135. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Mylan's financial condition and results of operations, and to correct promptly any public statements issued by Mylan which had become materially false or misleading.

136. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Mylan disseminated in the marketplace during the Class Period concerning Mylan's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Mylan to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Mylan within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Mylan securities.

137. Each of the Individual Defendants, therefore, acted as a controlling person of Mylan. By reason of their senior management positions and/or being directors of Mylan, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause,

Mylan to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Mylan and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

138. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Mylan.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: October 13, 2016

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*

Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016

Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***

**CERTIFICATION PURSUANT**
**TO FEDERAL SECURITIES LAWS**

1. I, Landon W. Perdue, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Mylan N.V. ("Mylan" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3. I did not purchase or acquire Mylan securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Mylan securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in Mylan securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7. I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8. I declare under penalty of perjury that the foregoing is true and correct.

**Executed** 10-8-16
**(Date)**

**(Signature)**

Landon W. Perdue
**(Type or Print Name)**

**MYLAN N.V. (MYL)** **Perdue, Landon W.**

**LIST OF PURCHASES AND SALES**

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|
| 8/26/2016 | Purchase | 50 | $42.8500 |